**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

**MAR 2 4 1997**

JASPER DIVISION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

UNITED STATES OF AMERICA,       )
                                )
     Plaintiff,                 )
                                )
v.                              )  CIVIL ACTION NO. 96-HM-0216-J
                                )
CERTAIN REAL PROPERTY LOCATED   )
NEAR HIGHWAY 195, WINSTON       )
COUNTY, ALABAMA, TOGETHER WITH  )  **ENTERED**
ALL IMPROVEMENTS, FIXTURES,     )
AND APPURTENANCES THEREON,      )
                                )  **MAR 2 4 1997**
     Defendant.                 )

## MEMORANDUM OPINION

The plaintiff United States of America has moved this Court for summary judgment in its favor and against the defendant real property, pursuant to Rule 56, Fed.R.Civ.P., on the basis that there is no issue as to any material fact regarding the use of the defendant real property for an illegal gambling business in violation of 18 U.S.C. § 1955, or to the claimant's knowledge of and consent to that fact. For the reasons set forth below, the plaintiff's motion for summary judgment is due to be and is hereby GRANTED.

## BACKGROUND

In the spring of 1992, the FBI launched an investigation into the CCSC after receiving information from several state police agencies about a cockfighting arena at Clear Creek, located in Winston County, Alabama; the state agencies had records of complaints about cockfighting at Clear Creek dating back as far as 1969. A narcotics agent for the Alabama Alcoholic Beverage Control

Board, acting in an undercover capacity, visited the Clear Creek Sportsman's Club ("CCSC") on two occasions during the course of a joint federal-state investigation: on May 16, 1992, and one week later on May 23, 1992, the day of the execution of a federal search warrant.

On May 12, 1993, the United States filed a civil forfeiture action seeking, in part, the in rem forfeiture of the named defendant real property for its alleged use in violations of 18 U.S.C. § 1955.  See U.S. v. Certain Real Property located near Highway 195, Winston County, Alabama, CV-93-HM-0945-J (N.D.Ala.). The only claimant to appear and challenge the forfeiture was Melphia Bailey Woods. As part of the discovery process, counsel for the government and Mrs. Woods conducted a number of depositions. However, the United States later moved this Court to dismiss its forfeiture action on procedural grounds, pursuant to Rule 41(a)(2), Fed.R.Civ.P., in light of the decision of the United States Court of Appeals for the Eleventh Circuit in United States v. 2751 Peyton Woods Trail, S.W., Atlanta, et al., 66 F.3d 1164 (11th Cir. 1995). This Court found the plaintiff's motion to be well taken, and dismissed that action on January 11, 1996, without prejudice and with leave to refile a similar action prior to the expiration of the applicable statute of limitations.

On January 26, 1996, the United States of America initiated this second civil forfeiture action against the defendant real property pursuant to 18 U.S.C. § 1955(d). Specifically, the government's complaint alleged that the defendant real property and

2

the building situated thereon, known as the Clear Creek Sportsman Club, was used in an "illegal gambling business" in violation of the federal anti-gambling statute, 18 U.S.C. § 1955, and was, therefore, subject to forfeiture to the United States.

Again, Melphia Bailey Woods was the sole claimant to the defendant real property. Mrs. Woods again denied any knowledge of the property's use in illegal gambling; she also realleged that the property was illegally seized by the government. With all discovery having been completed prior to the dismissal of the first case, which involved the same parties and the same issues, both the United States and Mrs. Woods proceeded to file motions for summary judgment in their favor.

## FINDINGS OF FACT

The evidence before this Court consists of the verified pleadings of both parties; the deposition transcripts of Green Fountain, a narcotics agent for the Alabama Alcoholic Beverage Control Board, FBI Special Agents William K. Bryan, Julie Rohr, and Roy Edgar Long, and claimant Melphia Bailey Woods; and affidavits from Mrs. Woods and Supervisory Deputy U.S. Marshal Meldrim F. Middlebrooks. The testimony of the law enforcement agents who were present at the CCSC is undisputed by Mrs. Woods.

Having fully considered all of the evidence submitted herein by both parties in support of their respective motions, the Court makes the following findings of fact:

1. That the Clear Creek Sportsman's Club (CCSC) was the site of illegal gambling activity.

3

2. That as a part of their investigation into illegal gambling, state and federal law enforcement agents, acting in undercover capacities, observed the cockfighting and gambling among the patrons of the CCSC.

3. That agents observed the operation of betting pools at the CCSC.

4. That claimant Melphia Woods and her husband, Giles Woods, built the CCSC in 1981; that the CCSC was used for conducting cockfights; that she assisted in operating the CCSC both while her husband was alive and then after his death; and that she knew about the ticket pool.

5. That patrons would come through the concession stand and ask Ms. Woods if she wanted to take a "chance" on the pool.

6. That when asked for the first time during her deposition whether anyone ever bet on the cockfights, Ms. Woods stated that she "didn't know how to answer the question." And rather than denying that betting did occur, she described how people around the pit would say such things as "I'll give you one" and "I'll give you two," but claimed that she didn't know <u>how</u> these verbal exchanges worked.

7. That Mrs. Woods admitted that she knew that individual CCSC patrons placed bets with one another during the cockfights.

8. That after agreeing to sell the CCSC, Melphia Woods continued her association with the CCSC until it was closed in 1992 by operating the concession during the 1987-1988 season and,

4

thereafter, cleaning up the CCSC after every cockfight for $6 an hour, which she split with a helper.

9. That according to Mrs. Woods's own deposition testimony, at least seven people were involved in the CCSC operation.

10. That the CCSC originally opened in October, 1981, and operated for at least a part of every cockfighting season, except for the 1984-1985 season, until the CCSC was closed in 1992.

11. That cockfights were held once every two weeks throughout the cockfighting season, which ran from the end of October until the following June or July.

12. That at the time the federal search warrant was executed on May 23, 1992, the CCSC had been in operation for ten of the previous eleven years.

13. That at CCSC, Agent Fountain paid an admission fee and made the following observations which indicated that the CCSC was, in fact, a well-organized cockfighting operation: that there was an arena-type area which included a main pit, drag pits, and stands for viewing the cockfights; that the birds were weighed in before going into the pit; that there was a concession stand for sharpening the roosters's gaffs and for selling cockfighting supplies; that in the pit, referees conducted the cockfights; that after fighting in the main pit, the birds were usually taken to a drag pit to finish their fight; that announcements from a public address system controlled the procession of cockfighters and birds into the main pit and afterwards into the drag pits; that the outcomes of the cockfights were tracked on a tote board; that over

5

200 people attended the cockfights; and that cockfighting at the CCSC was constantly ongoing and at times involved three different cockfights occurring simultaneously.

14.     That Agent Fountain also observed spectators openly gambling at the CCSC.  While sitting in the stands, Fountain noticed that every time two birds came into the cockfighting pit, a majority of the adult men and women spectators in the stands began to make bets on the outcome of the cockfight.  During the betting, spectators would announce what bird they wanted to bet on and the amount of money they wished to wager.

15.     That FBI Special Agent William K. Bryan, also acting in an undercover capacity, observed the cockfighting and gambling among the patrons of the CCSC just prior to the execution of the federal search warrant on May 23, 1992.

16.     That FBI Special Agent Julie Rohr interviewed Arthur "Dee" Cox, a patron of the CCSC, following the execution of the federal search warrant on May 23, 1992.  On that day, Cox had already wagered $100 three times at the CCSC and lost each of the three bets.

17.     That Agent Fountain also observed and participated in several betting pools at the CCSC.  While sitting in the stands on May 16, 1992, Fountain heard an announcement for a twenty dollar pool.  Fountain left the stands and purchased two twenty dollar tickets at the weigh-in area.  After buying the pool tickets, Fountain heard an announcement of the winners of the $20 pool and of the availability of tickets for a $10 pool.  Fountain bought

6

three tickets in the $10 pool. The individuals who sold the pool tickets operated the weigh-in station and acted as referees during the cockfights. A man selling pool tickets at the weigh-in station explained to Fountain that in order to win the pool, an individual had to pay money, pick a ticket, and hold the ticket with the winning number. Fountain also bought a betting pool ticket from the same people at the weigh-in station on May 23, 1992, the day the search warrant was executed.

18. That on May 23, 1992, FBI Special Agent Bryan purchased a betting pool ticket to win a cash prize from a table set up near the bleachers in the CCSC. Bryan observed that one of the people who sold him a pool ticket also acted as a referee for a cockfight. The pool tickets were numbered and assigned to certain birds, and the holder of the ticket with the number corresponding to the winning bird would win the betting pool.

19. That FBI Special Agent Roy Edgar Long, the case agent assigned responsibility for the investigation of the CCSC, determined that more than five, and perhaps ten or fifteen people were involved in the operation of the CCSC. The CCSC was owned by three individuals and the cockfights were conducted by at least three other persons serving as referees. In addition, Special Agent Long also noted that there were scoreboard keepers, announcers, concession workers, people manning souvenir stands, and gaff sharpeners.

20. That FBI Special Agent Julie Rohr interviewed Rufus Mann, an employee who stood by the gate and collected $10 from each car

7

as an admission fee to the CCSC. On the day of the search warrant, Mann collected approximately $2,000.00 from the cars.

21. That in addition to the approximately $2,000 in admission fees collected by Rufus Mann, CCSC patrons paid money for buying pool tickets, for buying drinks at the concession stand, and for buying T-shirts. Cockfighters paid an entry fee for the birds and also paid to have the spurs, or "gaffs," sharpened.

22. That the CCSC operations collected gross receipts well in excess of $2,000.00 on May 23, 1992, as evidenced by the fact that the law enforcement officers seized $36,755.41 in currency during their search that day.

23. That in 1987, Melphia Woods entered into an agreement to sell CCSC to Ralph Ausborn, Larry Ausborn, and Tommy Arwood; at the time of the execution of the search warrant on May 23, 1992, Melphia Woods was still in the process of selling the club to Arwood and the Ausborns.

### GOVERNMENT'S BURDEN OF PROOF

In this case, the court first must determine whether, as a matter of law, the United States has shown probable cause for forfeiture. See <u>United States v. One Single Family Residence Located at 18755 North Bay Road, Miami</u>, 13 F.3d 1493, 1496 (11th Cir. 1994); see also <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428, 1439 (11th Cir. 1991)(en banc). Probable cause "may be based wholly on circumstantial evidence, including those facts learned after the seizure" of the res. <u>U.S. v. $41,305.00</u>, 802 F.2d 1339, 1343 (11th Cir. 1986). Hearsay may

be used to establish probable cause. U.S. v. A Single Family Residence, 803 F.2d 625, 629 n.2 (11th Cir. 1986). The Eleventh Circuit has observed that the determination of probable cause is made "not with clinical detachment but with a common sense view to the realities of normal life." U.S. v. $4,255,000.00, 762 F.2d 895, 904 (11th Cir. 1985).

The elements for a probable cause showing of a violation of 18 U.S.C. § 1955 are as follows:

> [F]irst, the enterprise violates state law; second, the illegal gambling business involves five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business; and third, the business was either in substantially continuous operation for a period of thirty (30) days or had a gross revenue of $2,000.00 in a single day. 18 U.S.C. § 1955 [citation omitted].

18755 North Bay Road, Miami, 13 F.3d at 1496.

A examination of Alabama state gambling laws and the undisputed facts of this case plainly show the presence of all three required elements for existence of an "illegal gambling business" under federal law:

### (1) Violation of State Gambling Law

Alabama gambling laws read, in pertinent part, as follows:

Ala. Code § 13A-12-22(a):

A person commits the crime of **promoting gambling** if he knowingly advances unlawful gambling activity otherwise than as a player [emphasis added];

Ala. Code § 13A-12-20(4):

A person engages in **gambling** if he stakes or risks something of value upon the outcome of ... a future contingent event not under his control or influence, upon an agreement or understanding that he or someone else

9

will receive something of value in the event of a certain outcome .... [emphasis added];

Ala. Code § 13A-12-20(1):

A person **advances** gambling activity if he engages in conduct that materially aids any form of gambling activity. Conduct of this nature includes but is not limited to conduct directed toward the creation or establishment of the particular ... contest ... involved, and toward the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefor, toward the solicitation or inducement of persons to participate therein, toward the actual conduct of the playing phases thereof, toward the arrangement of any of its financial or recording phases or toward any other phase of its operation. A person advances gambling activity if, having substantial proprietary control or other authoritative control over premises being used with his knowledge for purposes of gambling activity, he permits that activity to occur or continue or makes no effort to prevents its occurrence or continuation [emphasis added];

Ala. Code § 13A-12-20(8):

[A **player** is a] person who engages in any form of gambling solely as a contestant or bettor, without receiving or becoming entitled to receive any profit therefrom other than personal gambling winnings, and without otherwise rendering any material assistance to the establishment, conduct or operation of the particular gambling activity [emphasis added];

Ala. Code § 13A-12-20(6):

[A **lottery** is an] unlawful gambling scheme in which ... [t]he players pay ... something of value for chances, represented and differentiated by numbers ... one or more of which chances are to be designated by the winning ones; and ... [t]he winning chances are to be determined by a drawing or by some other fortuitous method; and ... [t]he holders of the winning chances are to receive something of value [emphasis added];

Ala. Code § 13A-12-20(7):

[**Pari-mutuel** is a] form of lottery in which the winning chances ... are not determined upon the basis of a

10

>drawing or other act on the part of persons conducting or
>connected with the scheme, but upon the basis of the
>outcome of a future contingent event or events otherwise
>unrelated to the particular scheme [emphasis added].

Finally, **unlawful gambling** refers to any gambling not specifically authorized by law. See Ala. Code § 13A-12-20(12).

The spectators at CCSC, in staking money upon the outcome of cockfights, contests over which the spectators had no control or influence, clearly were gambling under Alabama law. See Ala. Code § 13A-12-20(4). Gambling in connection with cockfighting is not specifically authorized by law and, therefore, constitutes unlawful gambling under Alabama law. See Ala. Code § 13A-12-20(12) (1984). In fact, keeping a cockpit and cockfighting in and of themselves are unlawful in Alabama. See Ala. Code § 13A-12-4 (1984). Given the open and extensive nature of the wagering among the spectators; the operators of the CCSC undoubtedly knew of the spectators' wagering and, by managing the CCSC and exercising proprietary control over the cockpit, effectively promoted unlawful gambling activity in violation of Ala. Code § 13A-12-22(a).

In buying "pool" tickets, CCSC patrons paid money for a numbered ticket associated with a particular rooster. The holder of the ticket with the number of the rooster winning the cockfight won the money in the "pool." Such a betting pool constitutes unlawful pari-mutuel betting under state law. See Ala. Code § 13A-12-20(7) (1984). Again, the operators of the CCSC promoted unlawful gambling by virtue of the "pool" operated by the referees and by conducting the cockfights, the contests upon which the

11

gambling was based. Therefore, the operation of the CCSC clearly constituted an illegal gambling business under the laws of Alabama.

### (2) Involvement of Five or More Persons

The deposition testimony of Mrs. Woods and FBI Agent Roy Long establish that the CCSC was a significant illegal sporting operation which involved more than five persons performing a number of assignments, such as collecting parking fees, working as referees, selling souvenirs and cockfighting equipment, and operating the concession stand.

### (3) Continuous Operation/Gross Revenue

Again, Mrs. Woods's own deposition testimony establishes that she and her husband began the CCSC, and operated it continuously for illegal gambling purposes for years. The alternative element--gross revenue in excess of $2,000 in any single day--is also established by the fact that law enforcement agents seized $36,755.41 in currency from the CCSC on May 23, 1992.

Accordingly, the Court finds ample probable cause to believe that the defendant real property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 1955(d).

### CLAIMANT'S BURDEN OF PROOF

Once the United States has established probable cause in this forfeiture action, the burden of proof shifts to the claimant to prove by a preponderance that the defendant property was not used illegally. 18 U.S.C. § 1955(d) (customs procedures, 19 U.S.C. §§ 1602-1617, made applicable to gambling forfeitures). The Court notes that there is no "innocent owner" defense found within the

provisions of § 1955(d); thus, the only issue is whether the defendant property was illegally used.

> The court, in deciding this issue [when the government has moved for summary judgment], first must determine whether the government has met its "initial responsibility" of demonstrating the absence of a genuine issue of material fact-that is, taking all the evidence in the light most favorable to the claimant, has the government shown that no reasonable jury could award the property to the claimant? The government because it does not bear the burden of proof on this issue, may meet this burden by either pointing out to the court specific portions of the record that it believes demonstrate that the claimant cannot show by a preponderance of the evidence that he is entitled to the property, [citation omitted], or by introducing affirmative evidence negating the claimant's case. If it meets this burden, and the claimant, in response, fails to introduce significant, credible evidence sufficient to show that a reasonable jury could find, by a preponderance of the evidence, that the claimant is entitled to the property, the government is entitled to summary judgment; the nonmoving party has failed to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex, 477 U.S. at 323, 106 S.Ct. at 2552.

United States v. Four Parcels of Real Property, 941 F.2d at 1439.

Mrs. Woods, who has attended cockfights since 1949, has offered no significant, credible evidence sufficient to show that a reasonable jury could find, by a preponderance of the evidence, that she is entitled to the defendant real property.

### CLAIMANT'S MOTION FOR SUMMARY JUDGMENT

Claimant Melphia Bailey Woods has also filed a motion for summary judgment in her favor. Her motion does not challenge the merits of the government's allegations; rather, she contends that the government seized the defendant real property without affording the claimant prior notice and an opportunity to be heard, resulting

13

in a violation of her right to due process under the Fifth Amendment. See <u>United States v. James Daniel Good Real Property</u>, 501 U.S. ___, 114 S.Ct. 492 (1993).

In the first forfeiture action, the U.S. Marshal seized custody of the defendant property without any pre-seizure notice or hearing, in accordance with then-existing procedure and caselaw. However, the government voluntarily requested dismissal of that first forfeiture action after the Eleventh Circuit's decision in <u>Peyton Woods Trail</u>, <u>supra</u>, (citing the Supreme Court's decision in <u>Good</u>) which imposed a requirement a pre-seizure notice and hearing in real property forfeiture cases, was made retroactive in its application. The government also released its <u>lis</u> <u>pendens</u> and returned physical custody of the property to Mrs. Woods.

In this second forfeiture action, the government did not seek to seize physical custody of the defendant real property; instead, the U.S. Marshal recorded the government's <u>lis</u> <u>pendens</u> against the property in the probate court and posted notice of the pending forfeiture action upon the real property. The affidavit of Supervisory Deputy U.S. Marshal Meldrim Middlebrooks establishes that he personally posted the <u>in</u> <u>rem</u> warrant of arrest to the defendant real property, but did not post a 'No Trespassing' sign or attempt to seize or otherwise secure custody of the defendant real property, as was done in the first case. Furthermore, use of the word 'seizure' in the warrant of arrest <u>in</u> <u>rem</u> is of no consequence given the fact that the U.S. Marshal exercised no control over the defendant real property. Mrs. Woods has offered

14

no facts showing that the government has interfered with her right to occupy, use, enjoy, or receive rents from the defendant real property while this second forfeiture action has been pending. Therefore, no "seizure" of the defendant real property has occurred. See United States v. James Daniel Good Real Property, 510 U.S. ___, 114 S.Ct. 492, 501 (1993).

The government's posting of the warrant of arrest on the defendant real property and filing of a lis pendens did not trigger the Good requirements of prior notice to Mrs. Woods and an opportunity to be heard. In order to institute an in rem civil forfeiture action, the court must have actual or constructive control of the defendant property. "In the case of real property, the res may brought within the reach of the court simply by posting notice on the property and leaving a copy of the process with the occupant." United States v. James Daniel Good Real Property, 114 S.Ct. at 503. The government may arrest property with a warrant of arrest in rem without notice to the claimant and providing the claimant an opportunity to be heard. See id. at 503. Likewise, the government may file a lis pendens without notice to the claimant and providing the claimant an opportunity to be heard. Id.

This Court is satisfied that the government has not exercised dominion or control over the defendant real property during the pendency of this second action. Furthermore, the Good requirements of prior notice and an opportunity to be heard do not apply where the government simply posts the warrant of arrest on the defendant

15

real property and records its <u>lis</u> <u>pendens</u>. Accordingly, Mrs. Woods has suffered no constitutional harm by the absence of a pre-seizure hearing in this case, and her motion for summary judgment is due to be and is hereby DENIED.

## CONCLUSION

Claimant Melphia Woods's own deposition testimony shows that she and her husband built and began the Clear Creek Sportsman Club; that the CCSC was a well-organized and longstanding cockfighting operation conducted in violation of state gambling laws; that at least five people were involved in the CCSC operation; and that the CCSC had been in operation for years and generated significant revenues.

At the time the federal search warrant was executed on May 23, 1992, the CCSC had been in operation for ten of the previous eleven years. During that eleven year period from 1981 to 1992, Mrs. Woods was an owner, operator, employee, and patron of the CCSC. Even after she entered into a buy-lease agreement to sell the CCSC property prior to the 1987-1988 season, Mrs. Woods continued to visit the CCSC while the cockfights were ongoing; in fact, she was present at the CCSC on May 23, 1992, prior to the execution of the federal search warrant.

The evidence showing the illegal use of the defendant real property is overwhelming and undisputed. This evidence, including Melphia Woods's own sworn testimony, confirms that no genuine dispute exists as to the illegal use of the CCSC and to the

16

claimant's knowledge and consent of that illegal activity. Accordingly, the named defendant real property is due to be and hereby is FORFEITED to the United States as herein. A separate final order of forfeiture shall be entered contemporaneously herewith in this cause.

DONE this 24th day of March, 1997.

_____
E.B. HALTOM, JR.
Senior United States District Judge


FLORENCE, ALABAMA ADDRESS:

U.S. District Court
Northern District of Alabama
U.S. Post Office & Courthouse
210 North Seminary Street
P.O. Box 1076
Florence, AL  35630
Telephone: 205/760-8415

17